Minute Order Form (06/97)



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5280 | **DATE** | 9/28/2001 |
| **CASE TITLE** | Sears, Roebuck & Co. vs. Emerson Electric Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Motion of defendant Emerson Electric Company for summary judgment [16-1] is granted. Motion of plaintiff Sears, Roebuck & Co. for summary judgment [21-1] is denied. Count I is dismissed with prejudice. Judgment is entered in favor of the defendant on Count II.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | 9/28/2001 | |
| MD | courtroom deputy's initials | 01 SEP 28 PM 2:46 | date mailed notice | |
| | | Date/time received in central Clerk's Office | MD mailing deputy initials | |

AO 450(Rev. 5/85)Judgment in a Civil Case

# United States District Court
## Northern District of Illinois
### Eastern Division

Sears, Roebuck & Co.

v.

Emerson Electric Company

**JUDGMENT IN A CIVIL CASE**

Case Number: 99 C 5280

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

X   Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that the motion of defendant Emerson Electric Company for summary judgment is granted. Motion of plaintiff Sears, Roebuck & Co. for summary judgment is denied. Count I is dismissed with prejudice. Judgment is entered in favor of the defendant on Count II.

Michael W. Dobbins, Clerk of Court

Date: 9/28/2001

*Michael Dooley*

Michael Dooley, Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SEARS, ROEBUCK & CO. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 99 C 5280 |
| | ) |
| EMERSON ELECTRIC COMPANY | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sears, Roebuck & Co. ("Sears") filed this two-count breach of contract action against defendant, Emerson Electric Co. ("Emerson"), claiming that Emerson must indemnify Sears for compensatory damages awarded after a jury verdict in favor of a person injured by a power saw manufactured by Emerson and sold by Sears (Count I) and must reimburse Sears for attorneys' fees and costs in connection with the appeal of the judgment entered on the verdict (Count II). The parties agree that the controversy at issue in Count I has been resolved; therefore, Count I will be dismissed with prejudice. This opinion concerns the parties' cross motions for summary judgment on Count II. For the reasons set forth below, the court grants Emerson's motion and denies Sears' motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and

1

assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Both parties agree that this case can be resolved under the procedures provided by Rule 56.

## FACTS[1]

Emerson, a Missouri corporation whose principal place of business is in St. Louis, is engaged in the business of the manufacture of power tools. Sears, a New York corporation, is engaged in the business of the retail sale of merchandise and has its principal place of business in Hoffman Estates, Illinois. In 1968, Emerson and Sears entered into a business relationship by which Emerson supplied stationary power tools and other products to Sears. Their business relationship was memorialized in an agreement (the "1968 Agreement") and numerous amendments to that agreement over the years. In paragraph 7 of the 1968 Agreement, Emerson

---

[1]The facts are undisputed unless otherwise indicated.

2

warranted "that product sold hereunder will be of good workmanship and material, free of defects, merchantable, and will conform to specifications agreed upon by the parties. . . ." In paragraph 12 of the 1968 Agreement, Emerson agreed to "defend . . . and indemnify Sears from and against any and all liability and expense resulting from any alleged or claimed defect in product . . . including allegedly improper construction and design . . . ." In a January 1, 1985 amendment ("January 1, 1985 Amendment"), Emerson further agreed to

> defend . . . and indemnify . . . the entirety of any . . . action . . . so long as it involves, contains or includes, in whole or in part, any allegation as described in the Indemnity Provision or this Agreement and said obligations shall continue until such time . . . as the claim, action, liability, judgment . . . is limited solely to matters other than those described in the Indemnity Provision or this Agreement

and agreed to take on the "same obligations of defense and indemnity with respect to [Sears] as those of an insurance carrier under the law of Illinois."

Between 1971 and 1992 Emerson manufactured 10-inch and 12-inch radial arm saws, which Sears purchased and resold. The 12-inch saws were made for commercial/industrial use and were equipped with lower blade guards. The 10-inch saws were made for residential/home hobbyist use and were not equipped with lower blade guards. For a period of time during the mid-1980s, Sears advertised the 12-inch saws for residential use. Because of Emerson's concern that Sears' advertisement of the 12-inch saws for residential use could be misrepresented as evidence that the lower blade guard was a feasible and advisable addition to 10-inch saws in a residential/home hobbyist environment, Emerson and Sears entered into an agreement on November 24, 1986, amending Emerson's obligations to defend and indemnify Sears with regard to claims concerning radial arm saws ("November 1986 Amendment"). The November 1986 Amendment stated that ". . . Emerson will continue to indemnify and defend Sears for claims and

3

litigation arising out of the sale and use of the Craftsman 10" and 12" radial arm saws[,]" but that

> ... If in Emerson's reasonable judgement and in a given case, the series of Sears advertisements which have already been published result in an adverse judgement against Sears, Emerson, or both, Emerson and Sears shall confer to determine an appropriate Sears financial contribution, whether in whole or in part. ...

In March, 1990, Henry Lee Dendy ("Dendy") sued Emerson and Sears in state court in California, alleging that he was seriously injured by a 10-inch radial saw manufactured by Emerson and sold by Sears in 1976. Sears tendered the defense of the *Dendy* lawsuit to Emerson and, in accordance with the parties' agreements and past practices, Emerson retained defense counsel who represented both Emerson and Sears at the trial of the case in 1995. During the trial, Dendy presented evidence of Sears' advertisement of the 12-inch saws for residential use to refute Emerson's and Sears' contention that because the 12-inch saws were manufactured for a different market the existence of a lower blade guard on the 12-inch saws did not demonstrate that the 10-inch saws should also have been equipped with a lower blade guard. At the punitive damages phase, Dendy argued that punitive damages were appropriate against Emerson because Emerson resisted incorporating the lower blade guard as standard equipment on the 10-inch saws. Dendy portrayed Sears' document retention policy under which Sears destroyed complaints and other information about radial saw injuries as evidence of Sears' complicity in Emerson's alleged resistance to incorporating a lower blade guard as standard equipment on the 10-inch saws. The jury found that there was a defect in the design of the 10-inch saw, the defect existed when it left the possession of Emerson and Sears, and the defect caused Dendy's injury. On March 2, 1995, judgment was entered against Emerson and Sears in the amount of $634,800 in compensatory damages and in the amount of $1.6 million each in punitive damages.

After the judgment, Sears requested that Emerson indemnify Sears for the entire verdict, including the punitive damages award. Emerson declined to extend an "unqualified indemnification." On March 6, 1995, Michael Keating ("Keating"), Assistant General Counsel of Emerson, had a telephone conference with Kevin Condron ("Condron"), Assistant General Counsel of Sears, and Raymond Coyne ("Coyne"), an attorney in Sears' Law Department about the *Dendy* case. In response to the question whether Emerson would indemnify Sears for the full judgment in the *Dendy* case, Keating said that Emerson was "investigating the grounds for the judgment against Sears and that depending on how those facts laid out, we may or may not be able to indemnify them for the full amount of the judgment." Keating also stated that "there was some evidence at trial of independent conduct by Sears for which Emerson was not legally obligated to indemnify Sears, and that would impact Emerson's decision to fully indemnify Sears." Condron recalls that during the course of the telephone conversation, he "told [Keating] we needed separate counsel to represent us[.]" On March 7, Condron sent Keating a letter, stating:

> ... You advised us that Emerson is currently uncertain if it will indemnify Sears for the $1.6 million punitive damages verdict rendered against Sears .... If Emerson decides not to indemnify Sears, then Sears will need its own appellate counsel. ...
>
> Our conversation with our trial counsel leads us to believe that the basis for the jury's verdict was product design and warnings. Consequently, we believe Sears is entitled to indemnification for the entire amount of the verdict.

In response, Keating advised Condron in a letter of the same date as follows:

> ... Emerson is unwilling and unable to extend an unqualified indemnification to Sears on this matter, based on evidence of independent acts and omissions of Sears which were admitted into evidence at trial, e.g., the Sears misadvertisements and the scope and duration of Sears document retention program. Such a

5

qualified indemnification is justified for several reasons, *inter alia*, the Amendment to Contract of Purchase between Emerson and Sears, and various 1986 letter agreements between the Sears and Emerson Offices of General Counsel.

Keating retained the law firm of Horvitz & Levy as appellate counsel for both Emerson and Sears. Sears did not accept the services of Horvitz & Levy; however, without seeking Emerson's approval, or specifically notifying Emerson of its intention, Sears retained the law firm of Haight, Brown & Bonesteel (the "Haight firm") as its separate counsel. Emerson's counsel became aware "at some time that Sears was being represented by separate counsel." (Perrochet Dep. at 10). On July 14, 1995, Keating sent a letter to Coyne stating,

> ... Emerson was and continues to be willing to receive and weigh additional information which exculpate [sic] Sears' independent liability for compensatory and/or punitive damages in this matter. But as the matter presently stands, facts brought out at trial support a basis for independent Sears liability based on various acts and omissions, e.g., repeated Sears misadvertisements as to the intended market of the 12" radial arm saw, as well as the scope and duration of the Sears document retention program . . . .

Then, on July 21, in response to a July 19 query from Coyne as to whether Emerson would indemnify Sears for the entire verdict, Keating wrote, in part: "Emerson will not indemnify Sears for the verdict." In both the July 14 and July 21 letters, Keating generally cited, as the basis for Emerson's position, the parties' July 1, 1985 Amendment and the November 1986 Amendment.

After the trial court denied the post-trial motions of the parties, Emerson and Sears appealed the judgment to the California Court of Appeals. Emerson's counsel consulted with Sears' counsel in connection with the appeal. Roy Weatherup ("Weatherup") from the Haight firm testified that the purpose of the consultations between the Haight firm and Horvitz & Levy was "to coordinate our plans for the two appellants' opening briefs." Weatherup also testified

6

that there was a meeting on November 17, 1995 between the parties' counsel "to avoid any unnecessary conflict in the briefs that would prejudice one or both appellants." During the pendency of the *Dendy* appeal, Emerson and Sears entered into a termination agreement, dated October 31, 1997 ("1997 Termination Agreement"), which contained mutual releases. The 1997 Termination Agreement, provided, in part:

> Since Sears has terminated the 1968 Agreement, in accordance with its terms, effective as of September 30, 1998 (the "Termination Date"), Emerson and Sears shall have no further rights and obligations under the 1968 Agreement after the Termination Date, except as provided in this Agreement. Until the Termination Date, the terms of the 1968 Agreement shall be in full force and effect, except as provided below. In the event of any conflict between the terms of the 1968 Agreement and the terms of this Agreement, the terms of this Agreement shall control. Further, the parties acknowledge and agree that Emerson's obligations under paragraphs 7, 11 and 12 of the 1968 Agreement, as supplemented or amended by the January 1, 1985 Amendment, shall survive after the Termination Date.
>
> * * *
>
> Sears . . . hereby releases and discharges Emerson . . . of all Contract Claims which the Sears Releasing Parties (or any of them) ever had, now have, or may hereafter have against the Emerson Released Parties.
>
> * * *
>
> For purposes of this Agreement, the term "Contract Claims" refers to all claims, rights, actions, causes of action, suits, obligations, debts, demands, judgments, agreements, promises, liabilities, controversies, costs, expenses, and attorneys' fees, of whatever kind or nature, . . . that are based upon, or arise out of (i) Sears termination of the 1968 Agreement and/or the restructuring, relocation or shutdown of Emerson's power tool business, including (without limitation) all costs and expenses associated with, or arising out of, Emerson's cessation of production for Sears at the Paris Plant, or (ii) any alleged breach, on or before the date of this Agreement, of the 1968 Agreement or any other agreement or duty between the parties relating to Emerson's manufacture or sale of the Products to Sears.
>
> . . . This Agreement shall be governed and construed in accordance with Illinois law . . . .

On March 29, 1999, the California Court of Appeal affirmed the award of compensatory

and punitive damages.

After the decision, Sears sent a letter to Emerson dated April 27, 1999, stating that it was issuing a check to Dendy for "fifty percent of the total amount due, including compensatory damages, punitive damages and costs." On or about June 30, 1999, Sears demanded reimbursement for the compensatory damages that it paid to Dendy and for $132,567.43 legal fees and costs incurred by Sears in the appeal. (Sears paid the Haight firm $132,770.52.) On August 13, 1999, Sears filed the instant breach of contract complaint, seeking to recover the compensatory damages and its legal fees incurred in the appeal. Emerson answered the complaint, indicating that it had paid Sears for the compensatory damages, but that it had not paid Sears for the "attorneys' fees and costs of its separate appellate counsel," asserting that it "was not obligated to reimburse Sears" for such fees and costs. Sears agrees that Emerson indemnified Sears for the compensatory damages award but now seeks the $132,567.43 in attorneys' fees and costs incurred by the Haight firm.

## DISCUSSION

The parties agree that Illinois law governs this diversity action. Under Illinois law, to prevail on a breach of contract claim, a plaintiff must prove "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff." *Gonzalzles v. American Express Credit Corp.*, 315 Ill. App. 3d 199, 206, 733 N.E.2d 345, 351 (1st Dist. 2000); *see also Carroll v. Acme-Cleveland Corp.*, 955 F.2d 1107, 1114-15 (7th Cir. 1992). The standard of proof is preponderance of the evidence. *Lidecker v. Kendall College*, 194 Ill. App. 3d 309, 317, 550 N.E.2d 1121, 1126 (1st Dist. 1990). Emerson contends that it is entitled to judgment on Sears' claim for three reasons:

8

(1) under the 1997 Termination Agreement, Sears released Emerson from all contract claims, including the instant claim; (2) Emerson fully performed its contractual obligations by tendering appellate counsel to Sears in the appeal of the *Dendy* judgment; and (3) Sears failed to provide timely notice to Emerson of Sears' desire for reimbursement for the expenses of Sears' separately retained appellate counsel, which Emerson contends was a condition precedent to any duty to pay. Sears contends that its claim is not barred by the release but survives the parties' termination of their business relationship, and further argues that it is entitled to summary judgment because (1) a conflict of interest existed as a matter of law requiring Emerson (as having the obligations of an insurer) to pay for separate counsel for Sears and not merely tender joint appellate counsel; (2) Sears did not fail to provide timely notice of its desire for reimbursement; and (3) the attorneys' fees and costs are reasonable. Because the court finds that no conflict of interest existed, it is unnecessary to reach the first and third issues presented by Emerson, and the second and third issues presented by Sears. The court will assume that, despite the parties' apparent differing interpretations of the various contract documents and provisions, the release and survival language can be read together so as to give effect to their ordinary and natural meaning, and the release does not bar the present action. This court has jurisdiction over this action the pursuant to 28 U.S.C. § 1332.

Breach of Contract – Conflict of Interest

"A defendant's failure to comply with a duty imposed by the contract gives rise to [a] breach." *Gallagher Corp.* v. *Russ*, 309 Ill. App. 3d 192, 721 N.E.2d 605, 611 (1st Dist. 1999) (citation omitted). The parties agree that Emerson had a duty to defend Sears in the *Dendy* appeal. *See Maryland Cas. Co.* v. *Peppers*, 64 Ill. 2d 187, 355 N.E.2d 24, 28 (1976) ("If the

9

complaint alleges facts within the coverage of the policy or potentially within the coverage of the policy the duty to defend has been established."). The issue is whether Emerson fulfilled that duty. Emerson argues that it fulfilled its contractual duty to defend Sears by making an offer of counsel to jointly represent Emerson and Sears on appeal. Sears argues that when Emerson refused to indemnify Sears for any of the verdict, a conflict of interest arose which transformed Emerson's duty to defend into a duty to reimburse Sears for its separate appellate counsel, which Emerson has failed to do.

If an insurer believes that claims may not be covered by the policy, the insurer may either (1) seek a declaration regarding its obligations, (2) defend under a reservation of rights, or (3) do neither and risk the possibility that it may later be found to have breached the duty to defend. *Littlefield v. McGuffey*, 979 F.2d 101, 105 (7th Cir. 1992) (citation omitted). The only time an insurer can, and must, relinquish the defense of the insured, is where there is a serious conflict of interest; in which case, the insured is entitled to assume control of the defense and may do so by selecting independent counsel. *See id.* at n.3 (citing, inter alia, *Thornton v. Paul*, 74 Ill. 2d 132, 384 N.E.2d 335, 343 (1978); *Murphy v. Urso*, 88 Ill. 2d 444, 430 N.E.2d 1079, 1082 (1981)); *Maneikis v. St. Paul Ins. Co. of Illinois*, 655 F.2d 818, 824 (7th Cir. 1981). In such a situation, the insurer's contractual duty to furnish a defense is satisfied by reimbursing the insured for defense costs. *Maneikis*, 655 F.2d at 824 (citing, *Thornton*, 74 Ill. 2d 132, 384 N.E.2d at 343); *Maryland Cas. Co.*, 64 Ill. 2d 187, 355 N.E.2d at 31. The rationale for this exception is that in certain conflict situations, the attorney appointed by the insurer to represent the insured who owes fiduciary duties to *both* of them, may find it financially advantageous to protect the insurer's interests over the insured's. *Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.*,

832 F.2d 1037, 1045 (7th Cir. 1987) (citing *Nandorf, Inc. v. CNA Ins. Cos.*, 134 Ill. App. 3d 134, 479 N.E.2d 988, 991 (1st Dist. 1985)).

A conflict of interest may be removed if the insured is willing to accept the defense furnished by the insurer after full disclosure of the conflicting interests. *Maryland Cas. Co.*, 64 Ill. 2d 187, 355 N.E.2d at 31. "This is commonly achieved through an offer by the insurer of a defense under a reservation of rights." *Hanover Ins. Co. v. Am. Eng'g Co.*, No. 93 C 4195, 1995 WL 654012, *2 (N.D. Ill. Nov. 6, 1995). "A proper reservation of rights informs the insured that the insurer will not refuse to defend, but intends to later challenge the issue of coverage based on certain provisions of the policy," enabling the insured to "make the choice as to whether it wishes to entrust its defense to the insurer, or secure its own counsel." *Id.* at *3 (citing *Royal Ins. Co. v. Process Design Assocs., Inc.*, 221 Ill. App. 3d 966, 582 N.E.2d 1234, 1239 (1st Dist. 1991)). However, "[if] a conflict of interest exists, and the insured has rejected insurer's defense under reservation of rights, an insurer is not wholly relieved of its duty to defend the insured. Instead, independent counsel must be appointed, and the insurer's duty to defend is transformed into a duty to reimburse the insured for the defense costs[.]" Lee R. Russ and Thomas F. Segalla, 14 COUCH ON INSURANCE § 202:34 (3d ed. 1999) (citing, *inter alia*, Illinois cases).

Here, Emerson offered to defend under a complete reservation of rights, which Sears rejected, so the issue is whether there was a conflict of interest such that only reimbursement for Sears' separate counsel would satisfy Emerson's duty to defend. *See Hanover*, 1995 WL 654012, at *3 ("It is the task of the court to determine whether there was an actual . . . conflict of interest which would render a defense by an insurer improper[.]"). If there was no conflict, Emerson had the right to defend and to control the litigation. The attorney retained by the insurer

11

to represent the insured has a fiduciary duty to both the insurer and the insured. *Maryland Cas. Co.*, 64 Ill. 2d 187, 355 N.E.2d at 30-31. "An insurer's interest in negating policy coverage does not, in and of itself, create sufficient conflict of interest to preclude the insurer from assuming the defense of its insured." *Nandorf, Inc. v. CNA Ins. Cos.*, 134 Ill. App. 3d 134, 479 N.E.2d 988, 992 (1st Dist. 1985); *Tews*, 832 F.2d at 1047. Beyond these truisms, however, the point at which a conflict arises is not entirely clear under Illinois case law. In *Thornton v. Paul*, 74 Ill. 2d 132, 384 N.E.2d 335 (1978), *overruled in part on other grounds by Am. Family Mut. Ins. Co. v. Savickas*, 193 Ill. 2d 378, 739 N.E.2d 445 (2000), for example, where an insured was charged with both negligence and battery in the complaint and the insurance policy covered only negligence, the Court found that a direct conflict of interest would have prevented the insurer from accepting the defense, because the insurer's interest would be just as well served by a finding of no liability as it would by a finding of battery (intentional act) which was not covered. *Id.* at 152, 384 N.E.2d at 343. The Court has also found that where an insurer represents two insureds whose interests in the litigation are adverse, a conflict of interest exists if, in order for the insurer to adequately represent one of its insureds, it would have to pick a strategy that would harm the other. *See Murphy v. Urso*, 88 Ill. 2d 444, 430 N.E.2d 1079, 1083 (1981).

In *Maneikis*, the Seventh Circuit construed *Thornton* as requiring that the insurer and insured must be "complete adversaries on a crucial issue which would necessarily be decided either one way or the other if liability was imposed," and where the disputed issue "could only resolve into one of two mutually exclusive outcomes, one of which would benefit the insurer, one of which would benefit the insured." 655 F.2d at 825. In *Nandorf*, however, an Illinois Appellate Court indicated that *Maneikis* too strictly construed Illinois law and followed a more

lenient approach, stating the test merely as "whether, in comparing the allegations of the complaint to the policy terms, the interest of the insurer would be furthered by providing a less than vigorous defense to those allegations." *See Nandorf*, 134 Ill. App. 3d 134, 479 N.E.2d at 992. In *Nandorf*, the insurer defended the insured on a claim of false imprisonment under a reservation of rights to deny coverage for punitive damages. The underlying complaint sought only $5,000 compensatory, but $100,000 punitive damages. The court, in reversing dismissal of the insured's complaint seeking a declaratory judgment of coverage and reimbursement of counsel fees, held that although there were not mutually exclusive outcomes, if the insured was found liable, the insurer's interests would be just as well served by a small compensatory damages award and large punitive damages award. The court noted that if the insured was found liable, it was in the insured's interest to argue for a finding of "good faith" which would absolve him of punitive damages, but the insurer had no incentive to argue for "good faith" because such a finding would not have prevented a compensatory damages award. *Id.*, 479 N.E.2d at 992.[2] *See also* 14 COUCH ON INSURANCE 3D § 202:28 (The conflict arises where " . . . the insurer's attorney could obtain benefit for the insurer by steering the litigation in favor of the uncovered claim."). The Seventh Circuit, while adhering to the test in *Maneikis*, has acknowledged that the

---

[2] Although not articulated, the concern would appear to be that the insurer had little interest in the defense because a $5,000 compensatory damages award was nominal and the insurer did not consider itself exposed for punitive damages. Thus, the insurer might be tempted not to expend money to prepare a vigorous defense, a choice that would be detrimental to the insured because of the punitive damages claim. *See Tews*, 832 F.2d at 1046 (Although the insurer denied coverage for all the claims because they alleged intentional acts, the court concluded that the insurer had sufficient incentive to vigorously defend because the insurer was "probably" obligated to indemnify for intentional acts, and although there were large amounts of punitive damages ($25 million in each of pendent counts and treble antitrust damages), it was conceivable that the request for compensatory damages might result in a large award.). *But see Illinois Mun. League Risk Mgmt. Ass'n v. Seibert*, 223 Ill. App. 3d 864, 585 N.E.2d 1130, 1137 (4th Dist.1992) (Ruling that claim for non-covered punitive damages presented conflict, extended *Nandorf* stating, "[P]roportionality between potential compensatory and punitive damages should not be the guiding factor.").

13

"Supreme Court of Illinois has yet to address whether a conflict exists when the allegations in a complaint include noncovered, punitive damages," *Littlefield*, 979 F.2d at 106 n.5, and in two cases where in an insurer claimed non-coverage for punitive damages found no conflict of interest even under the *Nandorf* test. *See id.* at 108; *Tews*, 832 F.2d at 1046.

Applying the principles from the cases discussed above, the court concludes that no conflict of interest existed authorizing Sears to retain separate counsel, and Emerson is, therefore, not obligated to reimburse Sears for the expenses incurred as a result of its doing so. After trial, Emerson communicated to Sears that although it would defend Sears on appeal, it would not indemnify Sears for the verdict because of "independent acts and omissions" and named two pieces of evidence, apparently persuasive to the jury at trial: (1) Sears' advertisement of the 12-inch saw with a guard to the residential consumer market, and (2) Sears' destruction of documents about earlier injuries.[3] The term "independent acts and omissions" apparently is derived from the January 1, 1985 Amendment and/or the November 1986 Amendment. But other than language in the November 1986 Amendment, which permits Emerson to determine an appropriate Sears financial contribution where Sears' advertisements result in an adverse judgment, there is nothing in the record to indicate that "independent acts and omissions" or punitive damages exclusions from the indemnity agreement existed.[4]

---

[3] According the undisputed facts, Dendy used the evidence of the advertisements to refute Sears' and Emerson's argument that the 10-inch saws were not defective due to a lack of lower blade saw, and the evidence of the document retention policy to support punitive damages against Sears, as evidence of Sears' complicity in Emerson's alleged resistance to incorporating the lower blade guard on the 10-inch saws.

[4] In none of the letters that Keating wrote did he point to specific provisions in either the July 1, 1985 Amendment or the November 1986 Amendment that exclude "independent acts and omissions" or punitive damages. Neither have the parties argued any specific exclusions regarding "independent acts and omissions" or punitive damages in their summary judgment briefs. From the court's review of the record, only one provision contained language regarding "acts or omissions," but appeared to apply to acts of Sears' agents. *See* Compl., Jan. 1, 1985 Amendment, ¶ 7 ("[Emerson] agrees to defend, . . . and indemnify Purchaser's agents, employees and distributors

14

There was no conflict of interest because there was no either/or situation in which, in order to adequately represent Emerson, counsel would have had to abandon Sears; and, there was no opportunity for Emerson to shift liability to Sears. This was a strict liability claim in which Sears and Emerson were inextricably bound. To prevail in a strict liability action, a plaintiff need only prove that a defect existed in the product and that the defect caused his injury. *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 479, 110 Cal. Rptr. 2d 370 (2001) (citing *Jiminez v. Sears, Roebuck & Co.*, 4 Cal. 3d 379, 383, 93 Cal. Rptr. 769 (1971)); *see also Wimberly v. Derby Cycle Corp.*, 56 Cal. App. 4th 618, 627, 65 Cal. Rptr. 2d 532 (4th Dist. 1997) (A manufacturer and retailer are both liable for a defective product, and they can adjust the costs of consumer protection between them in the course of their continuing business relationship.). In an action based on a design defect, the design is defective "either (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if . . . the benefits of the challenged design do not outweigh the risk of danger inherent in such design." *Merrill*, 26 Cal. 4th at 479, 110 Cal. Rptr. 2d 370 (citing *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 418, 110 Cal. Rptr. 2d 370 (1978)). In applying the latter standard, a jury may consider "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result form an alternative design." *Id.* (citing *Barker, Id.* at 431, 110 Cal. Rptr. 2d 370). In this strict liability situation, Emerson simply had no basis in law to assert a defense that

---

from . . . . claims . . . to the same extent that [Emerson] is required to defend . . . and indemnify [Sears] under the Contract of Purchase and this Agreement so long as the claims asserted pertain to acts or omissions within the course and scope of their employment and/or other relationship with [Sears].").

15

diverged from what would also serve Sears. Emerson would have had to argue that the 10-inch saw without a lower blade guard was not defective in the residential market, and that Sears alone caused the problem by improperly advertising the 12-inch guarded saw to the residential market. But this would have been a foolish position where the evidence (as recited by the California Court of Appeal) supported a finding that a lower blade guard as standard equipment on the 10-inch saw was feasible by 1976 and the technology had been available for some 40 years prior to Dendy's injury. The advertisements occurred in the mid-1980's. It is abundantly clear from the record that there was other material evidence of defect that the court found sufficient to support the verdict and that Emerson had ample incentive to defend on the issue of defect.

This is also not a *Nandorf* situation in which Emerson would defend vigorously only on the liability claims of defect but neglect the allegations of wanton conduct relating to punitive damages. Both Emerson and Sears were faced with large punitive damages awards for the delay. Indeed, the punitive damages award against Emerson was proportionately greater because Emerson was a less wealthy corporation than Sears. Emerson therefore had an incentive to argue strongly against the finding of delay. Moreover, Sears has not explained how Emerson could only argue against its own delay, but not that of Sears. The undisputed evidence is that Dendy used the evidence of Sears' document destruction policy to show Sears' complicity in Emerson's alleged resistance to incorporating the lower blade guard on the 10-inch saws, and, although the court singled out Sears' document retention policy in discussing its "conscious disregard" of accidents and the need to prevent them in the future, there was also substantial amount of evidence of delay that the court cited as applicable to both Emerson and Sears.

Finally, inasmuch as the parties have been arguing about conflict of interest or lack

16

thereof at the appellate stage, the court notes that the allegations of the complaint, including those respecting punitive damages, as well as the policy exclusions if any, existed at the beginning of the litigation, so whatever disincentives Emerson had to defend Sears existed from the outset, but Sears did not object to Emerson providing the defense. *Nandorf*, after all, does not say to look at the evidence to determine whether a conflict exists, but to compare the allegations of the complaint to the policy terms (exclusions) to see whether a less-than-vigorous defense would benefit the insurer. Here, because Emerson was faced with a situation where it might have to pay for the entire damage award of $634,800 compensatory and $3.2 million punitive, Emerson's interest would be furthered by providing a vigorous defense to all claims against Sears.[5]

Accordingly, the court concludes that Emerson did not breach its contractual duty to defend and therefore is not obligated to reimburse Sears for the attorney's fees incurred on the appeal.

---

[5]The court has considered the other cases cited by Sears but finds them inapposite. *See Mobil Oil Corp. v. Maryland Cas. Co.*, 288 Ill. App. 3d 743, 681 N.E.2d 552, 561-62 (1st Dist. 1997) (conflict existed where both parties acknowledged that insured would probably be found liable if case went to jury and judgment could include large punitive damages award and where the probability that the compensatory portion of claim would have exhausted policy limits, reasoning that it was in insured's best interest to settle but insurer would have lost nothing by refusing to settle and letting case go to jury); *see also Seibert*, 223 Ill. App. 3d 864, 585 N.E.2d at 1138 (reversing declaratory judgment in favor of insurer holding that where insurer defended under a reservation of rights a conflict of interest existed, reasoning that even though the complaint sought more compensatory damages ($10 million), then punitive ($5 million), the plaintiff in civil rights case faced a punitive damages award "which as a matter of law would be borne by him" and though the claims were not mutually exclusive the insurer would benefit from a finding that insured's conduct justified a punitive damages award, namely, insurer may be required to pay only minimal compensatory and significant punitive, and, if insured's conduct was ruled malicious, the insurer would not be liable for even compensatory damages which were excluded from indemnification); *Illinois Masonic Med. Ctr. v. Turegum Ins. Co.*, 168 Ill. App. 3d 158, 522 N.E.2d 611, 616 (1st Dist. 1988) (affirming order directing insurer to relinquish control of defense finding a conflict of interest existed where the complaint alleged that negligence occurred during one or more of three separate hospitalizations, but only one of the hospitalizations was covered by the policy term, reasoning that where insurer refused to indemnify insured for claims other than those covered by the policy term, the insurer's best interest lay in finding that malpractice if any occurred during one or both of the non-covered hospitalizations).

17

For the reasons stated above, the court GRANTS Emerson's motion for summary judgment [#16] and DENIES Sears' motion for summary judgment [#21]. The clerk is directed to dismiss Count I with prejudice and to enter judgment in favor of the defendant on Count II. This is a final judgment.

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Date: September 28, 2001